UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY MCLAUGHLIN
         Plaintiff,

v.                                                    Case No.  05-72305
                                                     Judge Avern Cohn

INNOVATIVE LOGISTICS GROUP, INC.,
and NANCY O'CONNELL,
         Defendants.
_____/

## MEMORANDUM AND ORDER
### (1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (D/E 26); (2) GRANTING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY AND EVIDENCE PERTAINING TO PLAINTIFF'S PRE-EMPLOYMENT DRUG TEST RESULTS AND ALLEGATIONS OF DRUG USE BY PLAINTIFF (D/E 24); (3) DENYING DEFENDANT'S MOTION TO LIMIT DAMAGES (D/E 26); AND (4) DENYING DEFENDANT'S MOTION TO STRIKE ADDITIONAL EXPERT WITNESSES NAMED BY PLAINTIFF (D/E 23)

## I. INTRODUCTION

This is an employment case.  Plaintiff, Mary McLaughlin (McLauglin) claims that -
her employer, defendant Innovative Logistics Group, Inc. (ILG), and her supervisor,
defendant Mary O'Connell (O'Connell), terminated her in violation of the Family Medical
Leave Act (FMLA) 29 U.S.C. § 2601, et seq.  McLaughlin asserts that defendants
interfered with her assertion of rights under the FMLA in terminating her for  absences
occurring on October 28 and 29, 2004, while she was receiving medical treatment for
hypertension.  McLaughlin asks for damages for the loss of past, present, and future
wages, as well as for emotional and mental distress.

Before the Court is the defendants' motion for summary judgment.  Defendants
argue that McLaughlin cannot establish a FMLA-interference claim because she did not

provide them with adequate notice of an FMLA- qualifying condition.  Alternatively, the defendants say summary judgment should be granted in their favor because after she was terminated, McLaughlin said she is totally disabled on applications for Medicaid, Social Security Disability Benefits, and insurance payments on her car; and because the defendants have discovered "after-acquired evidence" that McLaughlin used drugs.

   The parties also make the following motions:

- McLaughlin moves the Court to exclude testimony and/or evidence pertaining to her pre-employment drug test results and allegations that she used cocaine in 2001.

- The defendants move to limit damages.

- The defendants move to strike additional experts named by McLaughlin after the discovery cut-off date of July 21, 2006.

   For the reasons that follow: (1) the defendants' motion for summary judgment is DENIED; (2) McLaughlin's motion in limine to exclude testimony and evidence pertaining to her pre-employment drug test results and allegations that she used drugs is GRANTED. (3) the defendant's motion to limit damages is DENIED without prejudice as premature; (4) the defendants' motion to strike additional experts named by McLaughlin is DENIED.

## II.  BACKGROUND

   (1) McLaughlin was hired by ILG as an administrative assistant on June 18, 2001 under an "at- will" employment contract.  At all relevant times O'Connell was her supervisor.

    (2)  On June 14, 2001 McLaughlin took a drug test.  Approximately two weeks later the drug screen came back positive for cocaine.  ILG questioned her about the

results, and McLaughlin asserted that she did not take cocaine, and that the positive

result must have been caused by medication she was taking for a back condition.  At

ILG's request, McLaughlin took a second drug test on July 7, 2001 which came back

negative on July 10, 2001.  McLaughlin continued her employment with ILG and was

not subject to any further drug testing.

(3) In January, 2003 McLaughlin was diagnosed with hypertension[1] after being

hospitalized from January 10 to14, 2003.  Under doctor's orders, she stayed off work

until January 17, 2003.  Subsequently, McLaughlin began regular treatment with Dr.

Surinder Kaura (Dr. Kaura) for hypertension.  McLaughlin says that between the time

Dr. Kaura started treating her and her hospitalization from October 25 - 27, 2004, Dr.

Kaura treated or evaluated her for hypertension on 26 separate occasions.  McLaughlin

says that during these occasions, she used her sick days and her vacation days to

attend her doctor appointments.[2]  McLaughlin did not use FMLA leave for any of her

absences.

McLaughlin says that she told O'Connell that she was admitted into the hospital

---

[1] According to Plaintiff's treating physician, Dr. Kaura, hypertension is a medical condition characterized by abnormally high arterial blood pressure.  When hypertension spikes to excessive and dangerous levels, the condition is known as "hypertensive urgency" or "uncontrolled hypertension."  Uncontrolled hypertension can be fatal.  It frequently causes strokes, heart attacks, and the dissection of any existing aortic or brain aneurysm.  A patient can suffer from uncontrolled hypertension despite the timely taking of medications and full compliance with treatment orders.  The treatment for hypertension includes any combination of medication, hospitalization, rest, and avoidance of work.

[2] McLaughlin says that she was also treated for the colitis (inflammation of the colon) during this time.

for hypertension in January of 2003, and was receiving ongoing treatment for the condition until her termination. O'Connell denies knowing whether McLaughlin suffered from any specific condition and does not recall whether she was hospitalized in 2003. O'Connell, however, says that McLaughlin mentioned to her that she thought she was having problems with her blood pressure.

(5) Late in the evening of Monday, October 25, 2004, McLaughlin asked her mother, Jean Bostwick, to drive her to the Oakwood Hospital emergency room. There, McLaughlin complained of left-sided chest pain and tightness, radiation of the pain into both of her arms, a headache of one-hour duration, and nausea. McLaughlin's blood pressure was 202/121. She was placed on aspirin, nitroglucerin paste, intravenous blood pressure medication, and admitted for further treatment and observation. The emergency room physician diagnosed her with "hypertensive urgency." She was then admitted to the hospital overnight under the care of Dr. Kaura.

(6) McLaughlin says that she called her mother at approximately 6:30 a.m. on Tuesday, October 26, 2004, and asked her to call O'Connell to notify her of her hospitalization and inability to work. Bostwick says that she called O'Connell's office sometime prior to 8:00 a.m. and left a message stating that McLaughlin was in the hospital, that she was very ill, and that she did not know when her daughter would be discharged from the hospital. O'Connell says that she received the voice message, but recalls that Bostwick said only that McLaughlin was in the hospital, and that McLaughlin would be in contact with further information.

(7) McLaughlin says that she called and spoke to O'Connell sometime during the afternoon of Tuesday, October 26, 2004. McLaughlin says that she told O'Connell that

4

she had been hospitalized due to elevated blood pressure and that she did not know when she would be released to return to work, and that she would call with further updates. O'Connell says that this phone call never occurred, and is not documented in the hospital's phone records. McLaughlin responds that she called O'Connell from a patient advocate's cell phone.

(8) On the morning of Wednesday, October 27, 2004, McLaughlin saw Dr. Kaura. He discharged her from the hospital at approximately 3:00 p.m, but instructed her to rest at home for the remainder of the day and to report to his office at 8:00 a.m. the next morning for a follow-up appointment.

(9) McLaughlin says that at approximately 7:30 a.m. on Thursday, October 28, 2004, she called O'Connell's office. McLaughlin says that she left a message stating that she had been released from the hospital; that she had a doctors appointment scheduled for that morning, and that she would return to work **if** her doctor cleared her to return. O'Connell says that she received a voice message but recalls that McLaughlin said she was taking a shower and was coming in to work. O'Connell says that she listened to the message a single time, then deleted it.

(10) McLaughlin went to her appointment with Dr. Kaura. Her blood pressure was 170/110, which he considered significantly elevated. He instructed McLaughlin to stay home from work until November 4, 2004, due to "uncontrolled hypertension." He provided her with a  work-excuse slip stating his recommendation, and advised her to go home and sleep if possible. McLaughlin said that she returned home immediately and went to sleep. She did not contact O'Connell or ILG with an update.

(11) On the morning of Friday, October 29, 2004, O'Connell terminated

5

McLaughlin's employment.  O'Connell says she terminated McLaughlin for failing to report to work or otherwise notify ILG on Thursday, October 28, 2004, and Friday, October 29, 2004.  O'Connell says she sent out a letter to McLaughlin at approximately 10:00 a.m. stating that McLaughlin was being terminated for excessive absenteeism. O'Connell did not call McLaughlin prior to terminating her.

(12) McLaughlin applied for Medicaid in January, 2005.  She told an interviewer that she suffered from hypertension and had a stroke earlier that month.

(13) McLaughlin also applied for Social Security Disability Benefits in January, 2005.  On her application McLaughlin stated that she was disabled due to hypertension, the stroke, and also colitis.  Her application for social security benefits was denied.[3]

(14) On April 27, 2005, McLaughlin signed a form seeking disability benefits from Guarantee Trust Life Insurance Company.  This form related to a certificate of insurance to provide car payments in the event that she became disabled.  McLaughlin wrote on the form that the "medical condition causing disability" was "high blood pressure--stroke."  McLaughlin wrote that she has been completely disabled since 10/25/04.  Dr. Kaura also filled out paperwork from the insurance company stating that McLaughlin was totally and completely disabled from "10-04 to present,"

(15) McLaughlin filed this lawsuit on June 10, 2005.

(16) On July 26, 2005 the defendant's counterclaimed that (1) McLaughlin made fraudulent representations to ILG not to pay a garnishment action which resulted in ILG paying approximately $700.00; and that (2) McLaughlin's poor work performance is in

---

[3]  The date of denial was not stated.

6

breach of her employment contract.  On August 11, 2006 ILG agreed to dismiss the

counter-claim relating to breach of contract, and on September 11, 2006 ILG agreed to

dismiss the counter-claim relating to fraud concerning the garnishment of wages.[4]

### III. ANALYSIS

### A.  The Defendants' Motion for Summary Judgment

### 1.  The Standard

Summary judgment will be granted when the moving party demonstrates that

there is "no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  There is no genuine issue of

material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving

party's response "must set forth specific facts showing that there is a genuine issue for

trial."  FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the

material facts is not enough; "the mere existence of a scintilla of evidence" in support of

the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must

---

[4]  McLaughlin argued in her motion for partial summary judgment that the counterclaims were retaliatory and in violation of the FMLA.  Rosania v. Taco Bell of America, Inc., 303 F. Supp. 2d (N.D. Ohio 2004).  McLaughlin requested that the Court *sua sponte* order the defendants to show cause on their counterclaims; and if they cannot, then to impose Rule 11 sanctions.  The Court declines to take this action as the counterclaims have been dismissed.

7

present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).

### 2.  McLaughlin's Interference Claim

#### a.  The Standard

The FMLA entitles qualifying employees up to twelve weeks of unpaid leave each year if, among other things, an employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided under [the

8

FMLA]." 29 U.S.C. § 2615(a)(1).  Employers who violate Section 2615 are "liable to any eligible employee affected" for damages and appropriate equitable relief.  29 U.S.C. § 2617(a)(1).

McLaughlin says that the defendants interfered with her rights under the FMLA by refusing to recognize her absence from October 26 -29, 2004 as qualifying for  FMLA leave.  To proceed with an FMLA interference claim, a plaintiff must demonstrate that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.   Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005)(citing Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 719 (6th Cir. 2003)).

The parties do not dispute that McLaughlin has met the first three requirements of the Cavin test.  However, the parties dispute whether McLaughlin's provided adequate notice to ILG of her need for FMLA leave.

### b.  Arguments

McLaughlin argues that as a matter of law she provided the defendant's with sufficient notice.  McLaughlin says that her need for work leave was "unforseen" in nature and is therefore controlled by 29 C.F.R. § 825.303(a), which provides that when the need for leave is unforeseen, the employee is afforded up to two working days from the time he or she learns of the need for leave to provide the employer notice.  See Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).  Notice can be provided by

a telephone call from the parent of an employee.  29 C.F.R. § 825.303(a).

As to the sufficiency of notice, McLaughlin points out that an employee "does not have to expressly assert [a] right to take leave as a right under the FMLA."  Cavin, 346 F.3d at 726.  The employee need not even mention the FMLA .  29 C.F.R. § 825.303(b); Walton 424 F.3d at 486.  Instead, the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."  Id.;  Cavin, 346 F.3d at 723-724.  "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case."  Id.

Once the employee communicates that leave is needed, "[t]he burden then shifts to the employer to determine whether leave was sought under the Act and to obtain any additional information."  Sahadi v. Per Se Technologies, Inc. 280 F. Supp. 2d 289, 298 (E.D. Mich. 2003).  If the employer lacks sufficient information about the employee's reasons for taking leave, the employer has the duty to inquire further to ascertain whether the leave is potentially FMLA-qualifying.  Cavin 346 F.3d at 726; Sadhadi 280 F. Supp. 2d at 698.  Moreover, where the employer has prior knowledge of the plaintiff-employee's serious health condition, there is a burden on the employer to inquire further whenever the employee calls in sick for medical reasons to determine if those reasons were FMLA-qualifying.  Miller v. GB Sales &  Service, Inc., 275 F. Supp. 2d 823, 829 (E.D. Mich. 2003)(J. Edmunds)(emphasis added).

Applying the rules of the above cases, McLaughlin argues that she provided adequate notice to the defendants that she was suffering from an FMLA-qualifying

10

condition through her mother's voice message to O'Connell, explaining that she had been hospitalized. McLaughlin compares the facts in her case to those in Cavin, 346 F.3d 713, in which the Sixth Circuit Court of Appeals held that a plaintiff had provided adequate notice to his employer of an FMLA-qualifying condition when he left a message with company security explaining that he had been in a motorcycle accident and had just been released from the hospital. McLaughlin also compares the facts here to those in Bryant v. Delbar Products, Inc., 18 F. Supp 2d 799, 805 (M.D. Tenn. 1998), in which the court held that the plaintiff had supplied sufficient notice to her employer of an FMLA-qualifying condition when she said, "My son is in the hospital and I've got to work things out."

McLaughlin further argues that the defendants had prior knowledge of her 2003 hospitalization and ongoing treatment for hypertension. In particular, McLaughlin points out that ILG produced during discovery O'Connell's calender which noted that "Mary" was "off" from January 13-17, 2003. O'Connell marked that Mary was "off in hosp." on January 14, 2003. ILG also produced McLaughlin's physician's slip stating that she had been hospitalized from January 10-14, 2003, and that she should remain off work until January 20, 2003. McLaughlin argues that because the defendants had prior knowledge that she suffered from hypertension, her mother's message was enough to shift the burden onto the defendants to inquire whether the absence was FMLA-qualifying (if it was not already clear to them). McLaughlin argues that they did not meet this burden because they  they never made any effort to determine if any of McLaughlin's absences from October 26, 2004, through October 29, 2004, were

11

covered by the FMLA, and they never requested a physician-certification of her need for leave.  Therefore, McLaughlin's argues, her initial notice to the defendants was sufficient for the entire duration of her leave.

McLaughlin also argues that she provided additional information to O'Connell of an FMLA qualifying condition when she called and told her that she had been hospitalized for high blood pressure and did not know when she would be released on October 26, 2004.  McLaughlin further argues that she updated O'Connell about her release from the hospital on October 27, 2005, and subsequent appointment on October 28, 2005 when she left a voice message on O'Connell's machine on the morning of October 28, 2005.  McLaughlin says she informed O'Connell that her return was conditioned on her doctor's approval.  She asserts that the fact that she did not return to work that day demonstrated to the defendants that her physician did not clear her for work and that she was still qualified for FMLA leave.

Alternatively, McLaughlin argues that even if the Court accepts O'Connell's recollection that McLaughlin stated that she would return to work on October 28, 2004, she is still entitled to proceed with her claim because the defendants prematurely terminated her employment in violation of the FMLA.  McLaughlin relies on 29 C.F.R. § 825.309(c), which governs situations in which an anticipated return to work is thwarted by the subsequent discovery of the need for additional leave time, provides that an employee is entitled to "two business days" to provide notice of the need for additional leave time.  See Paulson v. Superior Plating, Inc., 2004 WL 2203408 (D. Minn.) McLaughlin says that she learned of the need for additional time at approximately 10:00

12

a.m. on Thursday, October 28, 2004.  That means she had October 29, 2004 (a Friday), and November 1, 2004 (a Monday) to call in because ILG is not open during the weekends.  However, O'Connell terminated her on Friday, October 29, 2004.

The defendants respond that McLaughlin failed to provide sufficient and timely notice of need for FMLA leave because at no point did she request FMLA leave. Although the defendants aver that O'Connell received the message from McLaughlin's mother on the morning of October 26, 2005, they argue that McLaughlin herself should have called in.  O'Connell also denies receiving a phone call from McLaughlin on the afternoon of Tuesday, October 26, 2004 and points out that the hospital records reflect that the only number McLaughlin called on October 26, 2004 was to her own house. Likewise, defendants argue that McLaughlin's voice message on the morning of Thursday, October 28, 2004 was not sufficient notice of an FMLA-qualifying condition because she stated she had been released from the hospital and was coming into work.

The defendants compare the facts here to those in Henegar v. Daimlar Chrysler Corp., 280 F. Supp. 2d 680 (2003) in which the court found that an employee who called an automated telephone system and selected the "ill" option did not give adequate notice to his employer that he was suffering from an FMLA-qualifying condition.  The defendant's say that McLaughlin's actions are comparable because she left only voice messages for O'Connell and never specified (through her mother's message or her own message) what specific condition she was being treated for. Moreover, McLaughlin never followed up with O'Connell after her appointment with Dr.

13

Kaura on Thursday, October 28, 2004 or Friday, October 29, 2004.


### c. Resolution

McLaughlin has established that there is a genuine issue of material fact as to whether she provided the defendants with adequate notice of an FMLA-qualifying condition. First, O'Connell admitted during her deposition that she received a voice message on October 26, 2004 from McLaughlin's mother explaining that McLaughlin had been hospitalized. 29 CFR § 825.303(a) establishes that a phone call from a parent can be sufficient notice that the employee suffers from an FMLA qualifying condition. The fact that McLaughlin did not specifically request FMLA leave is immaterial. An employee does not have to specifically request FMLA leave to qualify for FMLA leave. Cavin, 346 F.3d at 726.

Further, the conclusion in Henegar is inapplicable here even though the plaintiff there and McLaughlin's mother both left voice messages instead of speaking directly to the employer and did not specify the absence-causing condition. There are key factual distinctions between these cases. First, in Henegar the court specifically noted that one of the reasons that the plaintiff did not provide adequate notice to his employer was because he "never attempted to contact his supervisor or human resources representative concerning the nature or severity of his illness." Here, McLaughlin's mother left O'Connell a voice message. O'Connell was McLaughlin's direct supervisor. Moreover, McLaughlin says that she called and spoke to O'Connell herself, and also left her a voice message regarding her release from the hospital and subsequent doctor's

14

appointment.  Although O'Connell denies that McLaughlin ever called her on the afternoon of October 26, 2004, or informed her of her appointment on the morning of October, 28, 2004, McLaughlin has given sworn deposition testimony to the contrary. Therefore, a jury, and not the Court, should decide which party is more credible.

Next, even if McLaughlin did not inform the defendants that she was hospitalized or absent because of hypertension, this case is still different than Henegar because McLaughlin has presented evidence that the defendants had prior knowledge that she suffered from hypertension.  Where the employer has prior knowledge that an employee suffers from a serious health condition, there is a burden on the employer to inquire further whenever the employee calls in sick for medical reasons to determine if those reasons were FMLA qualifying.  Miller, 275 F. Supp. 2d at 829.  The defendants have presented no evidence that they inquired into McLaughlin's reason for being hospitalized and for her subsequent absence from work upon her release from the hospital.  Therefore, it is for a jury to determine whether McLaughlin reasonably apprised the defendants that she was qualified under the FMLA to take time off for a serious health condition.

### 3.  Whether McLaughlin's Assertions that She is Disabled<br>Preclude her FMLA Claim

#### a.  The Standard

29 C.F.R. § 825.200(a)(4) provides that:

An eligible employee's FMLA leave entitlement is limited to a total of 12 work weeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform one or more of the essential functions of his or her job.

15

An employer does not violate the FMLA when it terminates an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave.  Edgar v. JAC Products, Inc., 443 F.3d 501 (6th. Cir. 2006).

### b.  Arguments

### 1.

The defendants argue that even if McLaughlin can establish an FMLA interference claim, they should still be granted summary judgment because McLaughlin and her treating physician have indicated that she was not able to perform the essential functions of her job at the end of the 12 week period of leave allowed under the FMLA. Edgar v. JAC Products, Inc., 443 501 (6th. Cir. 2006).  The defendant's say that if McLaughlin's proposed beginning date of FMLA leave began on October 26, 2004, the twelve weeks period would expire on January 18, 2005.  However, the defendant's point out that in her applications for Medicaid (January 2005); Social Security Disability Benefits (January 2005); and car payments through the Guarantee Trust Life Insurance Company (April 2005), McLaughlin asserted that she is "disabled" and "completely unable to work."  McLaughlin also told various health professionals during her evaluation for Social Security Disability Benefits that she also suffers from colitis and had a stroke in January, 2005.  McLaughlin said that she is wholly unable to perform her job duties because she suffers from symptoms associated with hypertension, has trouble walking, fears driving, cannot concentrate for more than a half hour at a time, has to make lists of what to do because she has suffered memory loss after her stroke, and has between 15-20 bowel movements a day.

16

McLaughlin responds that her claims for Medicaid, Social Security Disability benefits, and work-loss insurance benefits in which she said she is "disabled" do not preclude her from bringing an FMLA claim.  First, McLaughlin points out that the defendant's admitted in their papers that she was able to return to work.  In particular, defendants assert as affirmative defense number 28 that at all times McLaughlin "was able to perform the function of her position."  McLaughlin argues that this admission constitutes a judicial admission of fact, which is conclusively binding upon the defendants (unless amended).  Barnes v. Owens-corning Fiberglass Corp., 201 F.3d 815, 829 (6th Cir. 2000)(additional citations omitted).

Second, McLaughlin argues that her subjective beliefs of whether she is disabled or unable to work are irrelevant because under the FMLA only a "health care provider" can determine if an employee is able or unable to perform the functions of the job after the 12 week leave period.  29 C.F.R. § 825.115.  McLaughlin points out that she is not a health care provider and therefore is not competent to assess whether she has a disability.  See Brannon v. Oshkosh B'Gosh, Inc., 897 F.Supp. 1028 (M.D. Tenn. 1995) (additional citations omitted).

Third, McLaughlin says that two health care providers who have examined her have opined that she could return to work after November 4, 2004.  Dr. Stephen Gunther examined McLaughlin on August 7, 2006, and reviewed her records.  He concluded that McLaughlin was medically and physically able to work as an administrative assistant, or in a similar type of office-setting job from November 4, 2004 onward.  Next, Dr. Herbert Malinoff (the defendants physician), states in his report that

17

"[b]ased on the available medical evidence, she could have returned to work on October 25, 2004." McLaughlin also urges the Court to ignore Dr. Kaura's conclusion that she was disabled on her social security benefits application. McLaughlin says that Dr. Kaura never specifically evaluated her ability to perform her job as an administrative assistant with ILG, and he never advised her not to return to work. Instead, Dr. Kaura deferred to McLaughlin's assessment of whether she could handle the stress associated with her job.

**2.**

The defendants also argue that as a policy matter, McLaughlin should be judicially estopped from bringing an FMLA claim which clearly contradict her representations to the government when she applied for Medicaid and Social Security Disabilities.

McLaughlin responds that there is no policy reasons for precluding her recovering under the FMLA. McLaughlin relies on the analysis in Cleveland v. Policy Management Systems Corp., 526 US 795, 797-798. In Cleveland, the plaintiff brought an Americans with Disabilities Act (ADA) claim, after applying for social security disability benefits. Id. Like the defendants in this case, the defendants in Cleveland asserted that the employee's claim of disability precluded her claim under the ADA. Id. The Supreme court unanimously rejected the employer's position, explaining that:

> [I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system. Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many

18

> separate claims or defenses as the party has regardless of consistency."
> FED. RULE CIV. PROC. 8(e)(2). We do not see why the law in respect to the
> assertion of SSDI and ADA claims should differ.

Id. at 805.  The Supreme Court held that a plaintiff need only proffer an sufficient

explanation for the discrepancy in her statement of total disability for purposes of

applying for Social Security Disability Benefits, and later statements that she is able to

work.  Id. at 807.

McLaughlin says that she is similar to the plaintiff in Cleveland because she was

also denied Social Security Disability Benefits.  McLaughlin also  says she has a valid

explanation for claiming that she was totally disabled and unable to work.  She explains

that after she lost her job, she had no means of financial support, and had to apply for

Medicaid; but in order to be considered for Medicaid she was required to apply for

Social Security Disability Benefits.  McLaughlin also explain that she applied to

Gaurantee Trust Life Insurance company to pay her car payment due to her loss of

employment and not due to an inability to work.

### c.  Resolution

McLaughlin is not precluded from proceeding with her FMLA claim. She has

established that there exists a genuine issue of material fact as to whether she was able

to perform her duties as an administrative assistant at the end of the 12 week period of

leave allowed under the FMLA.  First, the Court is unable to conclude whether

McLaughlin was able to return work based on her applications for Medicaid, Social

Security Disability Benefits, or car insurance payments because the standards for

disability under these programs are different than the FMLA's standard.  Baumgarden v.

19

Challenge Unlimited, Inc., 2006 WL 334253 (S.D. Ill. 2006).  Likewise, a claim of
disability determined under a private insurance policy does not preclude recovery under
such statutes as the ADA or FMLA because of the differing standards.  See Griffith v.
Wal-Mart Stores, Inc., 135 F.3d 376, 383 (6th Cir. 1998).   Moreover, like the plaintiff in
Cleveland, McLaughlin's application for Social Security Disability benefits was denied[5],
and she has offered the assessments of Dr. Gunther and Dr. Malinoff who both
conclude that she was able to return to work in November, 2004.

Next, in accordance with Cleveland, McLaughlin has offered a satisfactory
explanation for why she applied for Social Security Disability benefits.  McLaughlin
explained that in order to obtain Medicaid benefits -- which she needed because ILG
had terminated her -- she had to apply for Social Security Disability Benefits.  Likewise,
McLaughlin told her insurance company that she was disabled so that her car payments
would be made while she remained unemployed.

### 4.  Whether McLaughlin's FMLA Claim is Precluded by "After Acquired" Evidence of Drug Use

#### a.  The Standard

After-acquired evidence of wrongdoing by a former employee is a complete bar
to any recovery by the former employee where the employer can show it would have
fired the employee on the basis of the evidence.  McKennon v. Nashville Banner
Publishing Co., 513 U.S. 352, 359 (1995).  After-acquired evidence does not affect, and
is it relevant to issues of liability, but is instead only relevant to the amount of damages

_____

[5]   It is unclear whether McLaughlin received Medicaid benefits.

20

to which the employee is entitled.  Thurman v. Yellow Freight System, Inc., 90 F. 3d
1160 (6th Cir. 1996).

### b.  Arguments

The defendants argue that summary judgment should be granted in their favor
pursuant to the "after-acquired evidence" doctrine because they now have reason to
believe that McLaughlin was using cocaine when she took a pre-employment screening
test, and therefore, they could have legitimately terminated her on those grounds.  As
stated in the facts, McLaughlin first drug test, taken on June 14, 2001, came back
positive for cocaine.  McLaughlin asserted that she did not take cocaine, and that the
positive result must have been caused by medication she was taking for a back
condition.  At ILG's request she took another drug test on July 7, 2001 which came back
negative on July 10, 2001.

The defendants say that they believed McLaughlin's excuse that the positive
drug test was caused by her back medication because her second drug test came back
negative.  However, the defendants say that they recently learned from an article titled,
"Drug screening for the courts: the good, the bad, and the ugly," from Michigan Lawyers
Weekly (July 17, 2006), that cocaine is not detectible in urine after three days.  From
this article, the defendants argue that the fact that McLaughlin's second drug test came
back negative does not establish that she did not use cocaine during the time of her first
drug test because the cocaine would have passed out of her urine after three days.  The
defendants say that had they known this information in 2001, they never would have
hired McLaughlin, and that she would have no claim for damages now.

21

McLaughlin responds that her pre-employment drug test results are not after-acquired evidence because ILG knew of the test results more than three years prior to her termination.  McLaughlin points out that she retook the drug test at ILG's request, and that they were satisfied with the results.  McLaughlin says that the defendant's argument that they did not know until recently that the initial test was probably accurate is insignificant now.  The defendant's could have investigated the accuracy of the test in 2001 and failed to do so.

Next, McLaughlin asserts that evidence of the initial drug test is incapable of forming a basis for summary judgment because it is inadmissible.  Ellis v. Washington County and Johnson City, Tennesee, 198 F.3d 225 (6th Cir. 1999)(A motion for summary judgment must be based upon admissible evidence).  She argues that the testimony regarding drug use and the drug tests should be excluded for the following reasons:

(1) They are in violation of Fed. R. Evid. 401 and 402 because the evidence and allegations of drug use are not relevant to any of the  FMLA issues;

(2) They are in violation of Fed. R. Evid. 403 because the evidence and allegations of drug use are improperly prejudicial;

(3) Evidence of prior drug use is not relevant to witness credibility, or truthfulness.  U.S. v. Tanksley, 35 F.3d 567 (6th Cir. 1994).   As such, opinion testimony, or reputation testimony, as to alleged drug use on the part of McLaughlin is inadmissible under Fed. R. Evid. 608(a) &(b).  Likewise, since the initial drug test is extrinsic evidence, it cannot be used to attack plaintiff's credibility under 608(b);

22

(4) They are in violation of Fed. R. Evid. 404(b) which listed the use of other "crimes, wrongs or acts" to situations in which motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident are at issue.  None of these are at issue in this FMLA action.

### c.  Resolution

McLaughlin's drug tests from the summer of 2001 are not after-acquired evidence.  To invoke the after-acquired evidence doctrine, an employer must discover evidence of the employee's wrongdoing <u>after</u> the termination of the employee. <u>McKennon v. Nashville Banner Publishing Co</u>., 513 U.S. 352 (1995).  When an employer has reason to know of the wrongful conduct <u>prior</u> to the date of termination, the alleged conduct cannot be utilized as "after-acquired" evidence.  <u>Delli Santi v. CNA Ins. Co.</u>, 88 F.3d 192 (3rd Cir. 1996).  Moreover, the article stating that cocaine passes out of the body within three days, is not itself after-acquired evidence of the employee's wrongdoing -- it is merely information the employer may use to interpret the drug test. Here, the evidence of McLaughlin's drug use is the first drug screening test.  It is undisputed that ILG had knowledge of the test results over three years <u>before</u> they terminated her.  Therefore, the test result cannot be used to preclude McLaughlin from damages now.

### B.  McLaughlin's Motion in Limine to Exclude Testimony and Evidence Pertaining to Her Pre-Employment Drug Test Results and Allegations of Drug Use

### 1.  Arguments

McLaughlin argues that testimony and evidence pertaining to her pre-employment drug test results and allegations that she used cocaine should be excluded

as irrelevant to her FMLA claim under F.R.E. 401 and 402 and unduly prejudicial under F.R.E. 403.

The defendants respond that evidence of prior drug should be admitted because drug use goes towards her credibility.   McLaughlin responds that evidence of prior drug use is not relevant to witness credibility, or truthfulness.  U.S. v. Tanksley, 35 F.3d 567 (6th Cir. 1994).

### 2.  Resolution

The Court will grant McLaughlin's motion in limine to exclude evidence and allegations drug use from this case because it is irrelevant under F.R.E 401 and 402 to the issue of whether she was qualified for FMLA leave.  The defendants evidence dates back to June, 2001, which is several years prior to the dates at issue here (October, 2004).  Such evidence would be unduly prejudicial under F.R.E. 403 and would merely tend to bias the jury against McLaughlin.

### C.  The Defendants' Motion to Limit Damages

### 1.  Arguments

The defendants request that should the Court deny their motion for summary judgment, that it limit the damages that can be awarded to McLaughlin.  The defendants say that as of June 30, 2005, McLaughlin's position was eliminated as a result of the loss of business.  Therefore, McLaughlin should not be able to make a claim for lost wages or damages subsequent to June 30, 2005.

### 2.  Resolution

The defendant's motion is premature, as a jury has yet to determine whether the

24

defendant's violated McLaughlin's rights under the FMLA.  The issue of damages will be litigated at trial.

### D.  The Defendants' Motion to Strike Any Additional Expert Witnesses Named by McLaughlin

### 1. Arguments

The defendants move the Court to prohibit McLaughlin's medical expert, Dr. Stephen Gunther, and any other experts named subsequent to the close of discovery from testifying on McLaughlin's behalf.  The defendant's argue that Dr. Gunther should not be allowed to testify because he was not identified until August 7, 2006, which was three weeks after the discovery cut-off on July 21, 2006.  The defendants assert that the late naming of Dr. Gunther is prejudicial to them.

McLaughlin responds that she did not name Dr. Gunther until August 7, 2006 because the defendant's did not produce their experts report (that of Dr. Herbert Malinoff) until July 19, 2006 -- just two days before the discovery cutoff, although they had the report for four months.  McLaughlin says that she did not receive the report until July 21, 2006 and did not know until she read the report whether it was necessary to retain an expert.  McLaughlin also says that she did not have time to depose Mr. Malinoff, and instead obtained Dr. Gunther to examine her record.  Finally, McLaughlin points out that she gave notice to the defendants that she might retain an expert in cardiology in her June 12, 2006 answers to interrogatories.

### 2.  Resolution

The Court will deny the defendants' motion because McLaughlin's delay in retaining Dr. Gunther appears to have been caused by the defendants not providing

her with Dr. Malinoff's expert testimony until 2 days before discovery was cut off.  The defendants have also failed to show how they have been prejudiced in this matter.

## V.  CONCLUSION

For the above stated reasons, the Court has (1) denied the defendants' motion for summary judgment; (2) granted McLaughlin's motion in limine to exclude testimony and evidence pertaining to her pre-employment drug test results and allegations that she used drugs; (3) denied the defendants' motion to limit damages without prejudice as premature; and (4) denied the defendants' motion to strike any additional witnesses named by McLaughlin.

SO ORDERED.

s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  January 30, 2007


I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 30, 2007, by electronic and/or ordinary mail.

s/Julie Owens_____
Case Manager, (313) 234-5160